## SHIRK *v.* LOFTIS BROTHERS & COMPANY.

1. An agreement in restraint of trade, ancillary to a contract of employ-ment, supported by a valuable consideration, and limited as to both time and territory, and not otherwise unreasonable, is enforceable.
2. If the consideration for such an agreement be legal, it is sufficient; the adequacy of the consideration is a matter to be determined by the par-ties thereto.
(*a*) If the consideration be so grossly inadequate as to shock the con-science and to amount in itself to evidence of fraud, equity will not enforce the agreement.
3. Under the evidence in the record the judge of the superior court did not abuse his discretion in holding that the business conducted by the plaintiff in error was in violation of the restrictive covenants in his contract with the defendant in error, and in granting an interlocutory injunction.
No. 969.　OCTOBER 17, 1918.

Injunction.　Before Judge Bell.　Fulton superior court.　April 26, 1918.

Sometime prior to August, 1917, Loftis Brothers & Co., a cor-poration, purchased the business of the Banta-Cole Co. at No. 5 South Broad Street in the City of Atlanta.　Prior to said sale the Banta-Cole Co. was engaged in business of buying and selling, on the installment plan, jewelry, watches, clocks, optical supplies, glassware, and articles of a similar nature.　M. Grant Shirk was employed by the Banta-Cole Co. as an optometrist, optician, and salesman.　After the transfer of the business to Loftis Brothers & Co., he remained with that company, performing for it the same services but without written agreement, until August 20, 1917, on

which date he entered into a written contract with Loftis Brothers & Co. This contract recites, that the corporation, the second party, is engaged "in the business of selling diamonds, jewelry, precious stones, clocks, watches, silverware, optical supplies, glassware, and other articles of a similar nature on the installment, part payment, or credit plan;" that the business so conducted "is of a peculiar nature, and its success depends upon certain methods of advertising and the use of certain systems, plans, and methods originated or used by" the corporation; that Shirk, the first party, "has and will further become familiar with the said methods, plans, and systems of carrying on said business, . . and will become possessed of secrets and confidential information pertaining to the various departments of said business, and has and will become personally acquainted with the customers and trade" of the corporation; and that "in consideration of his employment" Shirk "is willing to agree to all the covenants and conditions of this contract, all of which it is understood and agreed are necessary to the protection of the business" of the corporation. The material covenants and conditions of the contract are as follows: (1) "The said second party hereby agrees .to and does employ the first party for the term of one year from the fifteenth day of August, 1917, in such capacity and at such places and for the performance of such services and duties in and about the said business of the second party as the second party may from time to time require the said first party to perform, and the said first party hereby agrees to and does accept such employment upon the terms and conditions herein agreed." (2) "The first party hereby agrees that during the term of said employment he will devote his entire time and attention exclusively to the business and interests of said second party, and that he will perform to the entire satisfaction of the second party such duties as may be assigned to him, and that he will do his utmost to further enhance and develop the best interests and welfare of the second party and obey all rules and regulations of the second party." (3) "The first party agrees further that while he is in the employ of the second party, and for a period of four years after the termination of said employment, either by the expiration of the term of employment under this contract or for any cause whatever, he will not communicate or divulge to others, or use in any way, any information relating to the methods

of conducting the business of the second party, or its processes, methods, plans, forms, or systems used in carrying on and conducting its said business, nor its methods of advertising or solicitation of business, nor any knowledge or secrets which the first party may acquire from time to time pertaining to any department of the business of the second party." (4) "The first party further agrees that during said period he will not directly or indirectly sell or supply any article sold or dealt in by said second party to any person who shall have been a customer of said second party at any time while said first party may have been employed under this contract, nor will he in any way, directly or indirectly, solicit, divert, take away, or attempt to solicit, divert, or take away any of the custom, business, or patronage of such customers within said period." (5) "The said first party further agrees that during the continuance of his employment hereunder, and during the period of four years after the termination of his employment hereunder, as aforesaid, he will not directly or indirectly, under any circumstances or conditions whatsoever, for himself or any other person, firm, or corporation, engage in or be or become interested or be employed, directly or indirectly, in Atlanta, Fulton County, Georgia, as an individual, partner, stockholder, director, officer, clerk, salesman, buyer, principal, agent, employee, trustee, or in any relation or capacity whatsoever, in the line of business carried on by the second party, as aforesaid, and will not assist, advertise for, or give any information in relation to said business, directly or indirectly, to any one engaged, interested, or employed in any such line of business." (6) "In consideration of this contract and the salary herein stipulated, it is further understood and agreed that the party of the first part is to render service as a regular employee to the party of the second part or any of its affiliated concerns during the term of this contract, as the party of the first part may be required or directed by the party of the second part."

The contract was to remain in effect after August 15, 1918, until terminated by either party upon reasonable notice. The salary paid the employee before the execution of the contract was $25 per week, and his contract was terminable at the will of the company. Shirk remained in the employment of the company under the contract until February 28, 1918. About fifteen days prior to that date, he stated to the company that he was on the point of leaving

the city of Atlanta on account of family differences, and asked that the contract be terminated. He did not, however, leave the city of Atlanta, but immediately upon leaving the employment of the company he installed in his name as owner, at a place in the Arcade building in the city of Atlanta, and about 100 yards from, and on the same street with, the company's place of business, a stock of optical supplies, and began the business of fitting and selling optical supplies and repairing jewelry, watches, and clocks. Before Shirk left the service of the company he had entered into an agreement with one Creel, then employed by the company but who was about to sever his connection with it. Under the terms of this agreement Creel was to open up a jewelry business in the Arcade building, and Shirk was to conduct for himself, but not as a co-partner with Creel, the business of an optician, optometrist, and watch and jewelry repairer. The business cards of Creel and Shirk, indicating the business to be carried on by each of them, were printed and given out by Shirk before he actually severed his connection with the company. When Shirk severed his connection with the company he carried with him certain watches which had been left with the company for repairs; and he made or completed the repairs after his removal to the Arcade building, and there delivered them to the former customers of the company. Creel has no interest in the business of Shirk, and Shirk has none in the business of Creel, but the two lines of business are closely allied. It is the custom and necessity of a jewelry business to have some one connected therewith who is able to repair jewelry for the public, to set and reset stones in the jewelry sold, and to make good such guarantees as usually go with the articles sold by jewelers. It is an incident of the jewelry business, and especially of the jewelry business conducted upon the installment, part payment, or credit plan, to guarantee and keep in repair the articles sold. Shirk performed this service during the time he was employed by the Banta-Cole Co. and Loftis Bros. & Co., both before and after the execution of the written contract of August 20, 1917. In the jewelry establishment owned by Creel, Shirk repairs jewelry, watches, and clocks. He also repairs and carries in his own name optical supplies, and fits glasses according to the requirements of his customers. Both the Banta-Cole Co. and Loftis Bros. & Co. bought and sold optical supplies, and during Shirk's connection

with these two concerns it was his duty to sell such supplies and to use his skill and technical knowledge in adjusting glasses to the needs of purchasers. Both before and after the execution of the contract of August 20, 1917, the principal duties of Shirk were to adjust glasses and to repair watches, clocks, and jewelry.

Loftis Bros. & Co. filed its petition seeking to enjoin Shirk from violating his contract of August 20, 1917; and to the petition Shirk demurred and answered. The material facts are not in dispute, and are substantially as hereinbefore recited. The contentions made by Shirk were: (1) the contract is unreasonable as being in restraint of trade, and is without valuable and adequate consideration; (2) conceding the contract to be legal and based upon a valuable and adequate consideration, he had not violated the terms of his contract of employment with the petitioner, in which he agreed that he would not engage in certain lines of business, the same being that in which petitioner was engaged and described in detail in the contract. The court granted the interlocutory injunction, and the defendant excepted.

*W. H. Terrell*, for plaintiff in error.

*Rosser, Slaton, Phillips & Hopkins*, contra.

GEORGE, J. (After stating the foregoing facts.)

1. The contract involved is in restraint of trade, but the restraint is limited as to both time and territory, and is not otherwise unreasonable. *Jenkins* v. *Temples*, 39 *Ga.* 655 (99 Am. D. 482); *Rakestraw* v. *Lanier*, 104 *Ga.* 188, 196 (30 S. E. 735, 69 Am. St. R. 154). In the opinion in the case last cited it was said: "But if, considered with reference to the situation, business, and objects of the parties, and in the light of all the surrounding cimcumstances with reference to which the contract was made, the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as between them, and not specially injurious to the public, the restraint will be held valid. The true test, therefore, of the validity of such a contract is, whether it is supported by a sufficient consideration, and whether the restraint is reasonable." This court has thus adopted the test so clearly stated by Tindal, C. J., in Horner v. Graves, 7 Bing. 743: "We do not see how a better test can be applied to the question whether reasonable or not, than by considering whether the restraint is such

only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interest of the public. Whatever restraint is larger than the necessary protection of the party can be of no benefit to either; it can only be oppressive, and, if oppressive, it is in the eye of the law unreasonable. Whatever is injurious to the interests of the public is void, on the grounds of public policy." While a restrictive agreement by one who enters another's employment is not ancillary to the sale of a business, or the good will thereof, there can be no doubt that an agreement that during the term of the service, and for a reasonable period thereafter, the employee shall not become interested in or engage in a rival business, is reasonable and valid, the contract being otherwise legal and not in general restraint of trade. This is the rule followed by a majority of the American courts and is supported by reason. See 6 R. C. L. 805, and cases cited in note; *Kinney* v. *Scarbrough Co.,* 138 *Ga.* 77, 82-83 (74 S. E. 772, 40 L. R. A. (N. S.) 473), where the restrictive agreement ancillary to the contract of employment was held illegal because the restraint was unlimited as to territory. With respect to contracts of the character here under consideration this court seems to be committed to the rule that the contract must be limited both as to time and territory, and not otherwise unreasonable. If limited as to both time and territory, the contract is illegal if it be unreasonable in other respects. And with respect to restrictive agreements ancillary to a contract of employment, the mere fact that the contract is unlimited as to either time or territory is sufficient to condemn it as unreasonable. In this view of the matter, the rule announced by this court is in harmony with the rule generally followed by the courts of other States. With respect to a restrictive agreement ancillary to the sale of a particular business and the good will thereof, the absence of a limitation as to time or territory may become of considerable importance in determining whether the restraint imposed is so unreasonable as to be violative of public policy, and in many cases may become controlling upon that question. See, in this connection, *Seay* v. *Spratling,* 133 *Ga.* 27 (65 S. E. 137).

2. On the question of consideration, if there be a legal consideration, this is sufficient. The court will not make a bargain for the parties, and equity will not refuse to enforce the restrictive

covenants unless there be such gross inadequacy of consideration as to shock the conscience and amount in itself to evidence of fraud. *Rakestraw* v. *Lanier,* supra. The case differs from the class of cases of which *Hammond* v. *Georgian Co.,* 133 *Ga.* 1 (65 S. E. 124), is an example. Where an employee agrees to give his entire service to an employer, equity will not enforce the negative covenant, whether implied or express, unless the services of the employee are of peculiar merit and character and can not be performed by others. In the light of the foregoing we are of the opinion that the contract involved in this case is an enforceable one.

3. Did the plaintiff in error violate the terms of his contract of employment with the company? He contends that by the terms of the contract he was not to engage in the business of selling diamonds, watches, jewelry, optical supplies, etc. Admittedly, the plaintiff in error has installed in his place of business a stock of optical supplies and is selling them to the public generally, including the former customers of the company. It is not disputed that the repairing of watches, clocks, and jewelry sold by the company under a guaranty was a part and parcel of its business, and that the principal duties of the plaintiff in error while in the service of the company were the making of these repairs. The contract did not specify the particular services to be performed by the plaintiff in error. Generally he was to do anything required of him by the company in connection with the line of business carried on by it. Under the evidence the court did not abuse his discretion in finding that the business conducted by plaintiff in error was in violation of the restrictive covenants in his contract, and in granting an interlocutory injunction.

*Judgment affirmed. All the Justices concur.*