DEMIT OF VENEZUELA, C. A., a Foreign Corporation, and Nora Vasquez, Plaintiffs,

v.

ELECTRONIC WATER SYSTEMS, INC., a Florida Corporation, and Miguel Fava Brigante, a/k/a Miguel Fava, Defendants.

No. 80–1228–Civ–WMH.

United States District Court, S. D. Florida, Miami Division.

Sept. 30, 1982.

John Kearns, Miami, Fla., for plaintiffs.

Mark A. LeVine, Miami, Fla., for defendants.

MEMORANDUM OPINION

HOEVELER, District Judge.

On May 23, 1980, Demit of Venezuela, C.A. (Demit), a Foreign Corporation, and Nora Vasquez filed this action against Electronic Water Conditioners, Inc. (EWC), a Florida Corporation and its President Miguel Fava Brigante, a/k/a Miguel Fava (Fava) alleging that the Defendants misappropriated the Plaintiff's trade secret. As a result, the Plaintiffs sought an injunction to halt future use of Plaintiff's confidential information and damages for its unauthorized use.

After considering the record in this cause and the evidence and testimony presented during a bench trial, this Court reaches the following findings of fact and conclusions of law.

## I. BACKGROUND

From September 1970 to April 1974, Miguel Fava was employed by Demit of Venezuela as a salesman for their electronic water treatment systems. Throughout this period, Jose Vasquez Arias (Vasquez), the founder of Demit, acted as the company's chief executive officer and supervised the manufacture of all Demit equipment.

At the same time, Mr. Fava traveled extensively throughout South America marketing Demit products. As his tenure with the firm grew, however, he became more active in all facets of Demit's operation—including the manufacture of Demit water treatment devices. Ultimately, Mr. Fava was promoted to the position of Vice President for marketing and was given substantial responsibility for Demit's planning and operations.

The mainstay of the Demit product line was a electro-mechanical device known as the "Demit Electromagnetic Preventer & Scale Preventer" (Electromagnetic Preventer). This device was invented by Mr. Vasquez who refined the product over a period of twenty years. Its main purpose was to remove from water any minerals which could eventually cause scaling in boilers and pipes.

The Electromagnetic Preventer essentially consisted of two parts. The first section contained a electric control box which transformed alternating current to direct current. The second section consisted of a steel box which contained a chemically treated impeller through which a electromagnetic field was generated.

These elements were combined to operate under the theory that mineralized water, when forced through a electromagnetically charged chamber, would be separated from its water borne minerals thus eliminating the major cause of boiler scale.

Although other electronic water treatment devices employed similar principles to remove minerals from water, Demit's exact water treatment method was unique and thus formed the basis of the company's numerous Venezuelan, Colombian and Spanish patents. Moreover, the exact chemicals and method used to treat the Demit impeller was a trade secret which the company claims heightened the effectiveness of their product and distinguished it from those of their competitors. Consequently, Mr. Vasquez never revealed the exact chemical formula he used to treat his impellers until shortly before his death in 1980. At that time, he only disclosed the secret information to his daughter, Plaintiff Nora Vasquez.

While Mr. Fava was employed by Demit, he aided Mr. Vasquez in the firm's manufacturing operation and, after a period of time was entrusted to purchase the chemicals used in the impeller treatment process. Although Mr. Vasquez may never have explicitly told his employee that he was being given the formula to Demit's secret process, Mr. Fava was often given a list of chemicals to purchase as well as the amount of chemicals required for impeller treatment.

By April 1974, Mr. Fava and the Vasquez family differed over Mr. Fava's use of company funds. As a result, Mr. Fava was asked to leave Demit. Pursuant to his severance, the parties executed a "dissolution agreement" which included a financial settlement as well as Mr. Fava's agreement not to manufacture water treatment equipment or use or reveal any of Demit's confidential information.

In July 1974, however, Mr. Fava moved to Florida where he incorporated the Defendant company Electronic Water Systems, Inc. and began production of the Electro-Mag water treatment device. The Electro-Mag utilized the same basic principles as the Demit Electromagnetic Preventer and incorporated similar working parts—including, the Plaintiff's allege, an impeller treated with Mr. Vasquez's secret formula. Since 1974, EWS has been producing and marketing its own water treatment device and, according to its 1979 Federal Income Tax Return, posted gross earnings of $285,898.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

a) Defining the Trade Secret

As a general rule "A trade secret is protected against illegal appropriation and

commercial use by a competitor". *University Computing, Co. v. Lykes-Youngstown, Corp.,* 504 F.2d 518 (5th Cir. 1974) at 534. In order to define what actually constitutes a "trade secret", however, Florida Federal Courts have looked to the definition presented in Section 757 of the Restatement of Torts (1939). Consequently, in *Keystone Plastics, Inc. v. C. & P. Plastics, Inc.,* 340 F.Supp. 55 (S.D.Fla.1972), aff'd 506 F.2d 960 (5th Cir. 1974) Judge King defined a "trade secret" as:

> "Any formula, pattern, device or compilation of information which is used on (sic) one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *See Restatement of Torts,* Section 757, Comment (b) (1939).

While the Fifth Circuit stated that the Restatement for the most part merely requires that " . . . the parties view the process or device as secret and that the secret ʼ be revealed in confidence . . ." *University Computing,* supra at 534 quoting from *Water Services, Inc. v. Tesco Chemicals,* 410 F.2d 163 (5th Cir. 1969), the *Keystone* Court also applied the six part test outlined in Comment (b) of Section 757 and prescribed by the Seventh Circuit in *Forest Laboratories v. Pillsbury, Co.,* 452 F.2d 621 (7th Cir. 1971) which further defined "trade secrets" as:

> "information (1) is used in one's business, (2) which gives him an opportunity to obtain an advantage over competitors who do not know or use it, (3) which is secret, i.e., not common knowledge of the trade, (4) which is maintained in secrecy by the owner, (5) which is of value to a competitor, and (6) which was acquired at some expense to or effort by its owner." *Keystone Plastics,* at 74

■ In this case, the Plaintiff has the burden of showing that a trade secret exists and based on the evidence as presented, this Court concludes that the chemical formula Mr. Vasquez devised to treat Demit impellers did indeed constitute a legally protectable trade secret as described in either of the aforementioned tests.

There was no evidence to show that Demit used the Vasquez formula outside of its normal course of business nor did any party argue that Demit's impeller treatments were common to the trade or resulted from any source other than Mr. Vasquez's own years of research and development. The Defendants merely claimed that the Plaintiffs failed to show that the Vasquez chemical formula had any beneficial value—thus failing to satisfy the second and fifth segments of the *Keystone* test.

The Defendants assert that the chemical formula invented by Mr. Vasquez could not constitute a "trade secret" since a . trade secret must have *beneficial value* in order to give the owner an opportunity to obtain an advantage over its competitors. Although this Court may take issue with what the Defendant may view as *beneficial,* we are not upon called to render such an opinion since the Plaintiffs produced persuasive testimony showing that their treatment had beneficial value.

At trial Defendants argued that the chemical formula Demit used to treat its impellers was worthless and had no effect on the Electronic Preventer's electromagnetic properties. Plaintiffs, however, presented credible testimony to the effect that the Vasquez formula aided the electromagnetic properties of their product and that the chemically treated impeller was an indispensable element for its operation.

As a result, this Court concludes that the chemical formula used by Demit did indeed have value and gave its product a distinct advantage over competing water treatment systems. Therefore, Demit possessed a legally protected trade secret.

b) Liability for Misappropriation of Trade Secret

■ While this Court is satisfied that Mr. Vasquez's chemical formula was a legally protected trade secret, the Plaintiffs must also show that the Defendants' " . . . disclosure or *use* constitutes a breach of confidence reposed in him by the (owner of the secret) in disclosing the secret to him," [Sec-

tion 757, Restatement of Torts, (emphasis added)] in order to hold the Defendants liable for its unauthorized use. After considering the record, evidence and trial testimony presented in this case, the Court finds the Plaintiff's position most persuasive and thus holds Defendants liable for misappropriation of the Plaintiff's trade secret.

Defendant Fava was employed by Mr. Vasquez and Demit for approximately four years. During that time he gained Mr. Vasquez's trust to the point where his employer regularly sent him to purchase the chemicals he required for his secret formula. Moreover, the Defendant himself testified that Mr. Vasquez often handed him lists containing the amount needed of each ingredient. While Mr. Fava contends that he was never specifically told that he was being given Demit's trade secret, a man of Mr. Fava's intelligence (as evidenced by his educational background and numerous patent applications) could easily have surmised Mr. Vasquez's formula—especially when it was undisputed that Mr. Fava was the only person entrusted to purchase Demit's chemicals. Therefore, Mr. Fava had clear access to the trade secret.

However this Court finds that Plaintiff also presented a compelling case regarding Defendant's use of the Demit trade secret and found the overall testimony of the Plaintiff's witnesses most persuasive. Mr. Fava claimed that he could not be liable for misappropriating Demit's trade secret because EWS did not use any special chemicals to treat Electro-Mag impellers. In support of his position, Defendant produced an employee who testified that Mr. Fava merely dipped his impellers in used motor oil. The Court, however, heard credible testimony from Plaintiff's expert witness who stated that it was extremely improbable that the chemicals which appeared in tests on the Defendant's impeller, would be present on an impeller that was simply treated with used motor oil. Moreover, a second Plaintiff's expert testified that an impeller that was simply treated with motor oil would not produce the electromagnetic charge necessary for the operation of the Defendant's water treatment system.

In weighing this testimony, the Court also considered a number of facts presented in the record. It was uncontested, for example, that Mr. Fava left Demit's employ under less than amicable circumstances. The Plaintiffs presented credible testimony showing that the Defendant was asked to resign after a dispute concerning his use of company funds. While Mr. Fava's dissolution agreement contained detailed provisions regarding settlement of his financial involvement in Demit, the agreement also recognized Mr. Fava's former status as a trusted employee and thus attempted to prevent the Defendant from using any information he may have obtained while he was employed by Demit. Although this Court will not rule on the merits of the parties dissolution agreement, the Court notes that Mr. Fava incorporated his electronic water treatment business no more than three months following his resignation from Demit.

In addition, the Defendant's loan application to the Small Business Administration (SBA) and applications to the U. S. Patent Office, contained documents which implied that Mr. Fava possessed degrees in engineering—a fact contradicted at trial. Moreover, this Court found that there were significant differences between the financial statements Mr. Fava submitted to the SBA and those he submitted to the Internal Revenue Service. Finally, documents submitted by the parties show substantial outstanding court judgments against the Defendant.

Therefore, after considering all of this evidence, this Court finds the Plaintiff's testimony and arguments more compelling and thus concludes that the Defendants not only engaged in the unauthorized use of the Plaintiff's trade secret but also is liable for damages resulting from their misappropriation.

c) Damages

■ Now that the Court has concluded that the Defendant has misappropriated the Plaintiff's trade secret, we come to the

question of damages. As the Fifth Circuit stated in *University Computing,* supra, existing case law indicates that the standard for measuring damages is a flexible one. While fashioning a remedy in this type of case may be difficult, however, mere uncertainty should not preclude Plaintiff's recovery. The Fifth Circuit went on to outline a number of methods for computing damage awards in trade secret cases including assessments based on the misappropriation's benefit to the Defendant as well as the misappropriation's effect on the Plaintiff's profits.

Because of the paucity of usable evidence presented by the parties on the question of damages, the Court finds it especially difficult to measure actual damages using either approach. The Court, however, finds that here it is more logical to fashion a remedy based on a fair assessment of the trade secret's benefit to the Defendant since his financial records provide an indication of the trade secret's value or at least its use. In doing so, the Court finds that the "reasonable royalty" standard described in the *University Computing* case (*Id.* at 538) provides the most fair and equitable method of assessing damages.

In pre-trial discovery the Defendant denied keeping certain periodic financial records which may have provided greater insight into the trade secret's value to the Defendants. While the Defendant's income tax returns offer little help beyond suggesting that the Defendant operated a minimally successful business, the reasonably stated mandate of the Fifth Circuit compels a fashioning of damages where there has been a misappropriation. I find, under the circumstances presented by the evidence in this case, that a reasonable royalty of $5000 per year should be awarded to the Plaintiffs for unauthorized use of its trade secret and that the award should cover each of the years from 1975 to 1981.

Since the Plaintiff has also sought injunctive relief to halt Defendant's unauthorized use of its trade secret, it is further ordered that the Defendants shall forthwith cease using the Vasquez chemical formula to treat any part of its electronic water treatment device or any other water treatment equipment under the Defendant's control.

### FINAL JUDGMENT

THIS CAUSE having come before the Court for trial and the Court having heard arguments of counsel and the issues being duly tried, it is

ORDERED AND ADJUDGED that final judgment be and it is hereby entered in favor of the plaintiff, Demit of Venezuela, C.A., a foreign corporation, and Nora Vasquez, and against the defendants, Electronic Water Systems, Inc., a Florida corporation, and Miguel Fava Brigante a/k/a Miguel Fava, in the amount of Five Thousand and 00/100 Dollars ($5,000.00) for each of the years from 1975 to 1981, for which sum let execution issue. Costs which are proper shall be taxed by separate motion and order.