**SALSBURY LABORATORIES, INC.,**
**Plaintiff–Appellee,**

v.

**MERIEUX LABORATORIES, INC.,**
**Donald G. Hildebrand, Jack R.**
**Berg, Defendants–Appellants.**

No. 89–8593.

United States Court of Appeals,
Eleventh Circuit.

July 24, 1990.

Kenneth L. Millwood, Joyce B. Klemmer, Smith Gambrell & Russell, Atlanta, Ga., William J.T. Brown, Jeffrey A. Conciatori, Donovan Leisure Newton & Irvine, New York City, for defendants-appellants.

Gary B. Blasingame, Andrew J. Hill, III, Blasingame, Burch, Garard & Bryant, PC, Athens Ga., Peter D. Murray, John P. White, Cooper Dunham Griffin & Moran, New York City, for plaintiff-appellee.

Before CLARK and COX, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from a judgment in favor of Salsbury Laboratories, Inc. (Salsbury) for the misappropriation of trade secrets by two former Salsbury employees and their current employer, Merieux Laboratories, Inc. (Merieux), a company which competes with Salsbury in the commercial development of vaccines for veterinary use. Principally at issue is whether trade secret status may be accorded to Salsbury's process for producing a vaccine, on a commercial scale, to immunize chickens against a bacterium causing respiratory disease and, if so, whether the defendants misappropriated Salsbury's trade secret when Merieux developed and marketed a competing vaccine.

## I. STATEMENT OF THE CASE

Salsbury instituted this diversity action against Merieux and two of Merieux' employees, Donald G. Hildebrand and Jack R. Berg, who had previously worked for Salsbury.[1] The complaint alleged misappropriation of trade secrets and confidential in-

---

**1.** The complaint also named as a defendant Richard V. Leiting, another former employee of Salsbury who later joined Merieux. The parties agreed to his dismissal without prejudice.

formation (Count I), breach of contract (Count II), interference with contract (Count III) and unfair competition (Count IV). Salsbury sought a permanent injunction, monetary damages, costs and attorney's fees.

Salsbury moved for a preliminary injunction which the district court denied after holding an evidentiary hearing.[2] The case was tried without a jury on October 1–9, 1987. At the close of the trial, defendants moved to dismiss Counts II and III of the complaint on the ground that the trade secrecy agreements Hildebrand and Berg had signed while employed by Salsbury, prohibiting disclosure and use of Salsbury's trade secrets and confidential information, were contrary to the public policy of Georgia and therefore unenforceable. In an order dated March 28, 1988, the court denied the motion.

The trial court entered findings of fact and conclusions of law in an order dated April 5, 1989, 735 F.Supp. 1555. The court found that the specific ingredients and methods as combined by Salsbury in the production of its vaccine are unique to Salsbury and constitute trade secret information; the multi-step production process used by Salsbury to develop its vaccine does not exist as a whole in the public domain and constitutes Salsbury's trade secret; the production outline submitted to the United States Department of Agriculture (USDA) for licensing of its vaccine is a trade secret; the formulation for a stabilizing compound, Stabilizer H, developed by Salsbury is a trade secret; and Merieux, Hildebrand and Berg misappropriated Salsbury's trade secrets, making them liable on Count I of the complaint. The court stated that if it had not found in favor of Salsbury on Count I, it would have found in favor of Salsbury on its breach of contract claim. The court found it unnecessary, however, to make such a finding in light of its disposition of Count I.

The court enjoined defendants from disclosing Salsbury's trade secrets and from

using Stabilizer H but not from producing or selling the competing vaccine. In addition, the court awarded compensatory and punitive damages of $1,811,165, and in-house litigation costs and attorney's fees, in an amount to be determined. Defendants moved for reconsideration of the damage award. In a June 26, 1989 order, the court eliminated from the award of compensatory damages Salsbury's lost profits of $207,000 and $104,165 for price erosion. Instead, the court awarded $52,-000, representing the profits gained by Merieux in selling its competing vaccine. The court let stand a $1 million award, which represented defendants' gain from having taken advantage of the years of research, development, marketing, and advertising performed by Salsbury, and an award of $500,000 in punitive damages. Plaintiff was also awarded attorney's fees of $562,424.31 and other litigation expenses in the amount of $121,177.45. Defendants filed this appeal.

## II. FACTS

Appellee Salsbury is an American company that develops and produces veterinary products in the United States. It competes with appellant Merieux, a Georgia research and development company. Merieux is a wholly-owned subsidiary of Rhone–Merieux Laboratories of France, an international developer and producer of veterinary products. In 1979, Salsbury was contracted by a veterinarian in Texas to produce a vaccine for a flock of chickens infected by the microorganism *Mycoplasma gallisepticum* (MG). This bacterium causes respiratory disease in avian species, which lowers their egg-producing ability and diminishes the number, size and quality of the eggs and the chicks produced, resulting in economic loss. Salsbury successfully produced an autogenous vaccine: one made from an inactivated organism isolated from the specific flock of infected birds. To produce

---

**2.** The trial court determined that Salsbury produced sufficient evidence to establish a substantial likelihood of success on the merits but failed to show a threat of irreparable harm in the absence of an injunction.

the autogenous vaccine, or bacterin,[3] Salsbury used its own trade secrets and information available in the public domain.

Thereafter, Salsbury decided to attempt to produce an inactivated MG vaccine for the commercial market. Salsbury succeeded, and, in 1981, applied for a USDA license to market the vaccine it had developed. In 1982, the license was approved and Salsbury began marketing a commercial inactivated MG bacterin, "MG–BAC," which was the first of its kind to be licensed by the USDA. In its application for a USDA license, Salsbury submitted a detailed production outline specifying the exact procedure, chemicals and amounts used, and in what order, in making the vaccine.

Appellant Hildebrand began working as a Biologics Production Technician for a subsidiary of Salsbury in 1966. He was promoted to Biologics Production Manager at Salsbury's headquarters in 1973. Hildebrand received a promotion to Director of Biological Operations in 1982 and remained in that position until he left the company in November 1984 after being recruited to join Merieux. While at Salsbury, Hildebrand oversaw the production of the autogenous vaccine for the Texas flock and subsequently directed the research and development of the MG–BAC vaccine. Hildebrand also worked on the development and improvement of the compound used in freeze-drying live organisms, Stabilizer H (SBH).

Appellant Berg joined Salsbury as the Biologics Production Supervisor in November 1976, immediately after graduating from college. Berg reported directly to Hildebrand and was intimately involved in the development and production of Salsbury's MC–BAC. He began working at a Salsbury subsidiary in 1983. In the fall of 1985, he was recruited by Hildebrand to join Merieux as Operations Manager, which he did in January 1986.

The district court found that Salsbury's production process of MG–BAC comprises seven unique steps.

Salsbury was the sole marketer in the United States of a USDA-licensed inactivated MG vaccine from 1982 until April 1987, when Merieux introduced a competing vaccine, GALLIMUNE. The only other company with an inactivated MG vaccine on the market was Schering–Plough, which introduced its version in June 1987.

Salsbury also developed Stabilizer H, a compound for freeze-drying live organisms for storage. It is not used in producing MG–BAC, but Salsbury uses it in many of its live virus products. Hildebrand worked on SBH while at Salsbury and took a document with him containing the formulation when he left Salsbury. Merieux uses SBH, but not for production of GALLIMUNE.

At the time Hildebrand left Salsbury to work for Merieux as General Manager in November 1984, Merieux had not done any work developing an inactivated MG vaccine. Soon after Hildebrand arrived at Merieux, Merieux began to develop one. At Merieux, Hildebrand supervised work on the vaccine, employing the same strain of bacterium and the same medium in which to grow the organism as Salsbury used. Hildebrand gave his researcher and Berg a copy of the production outline Salsbury had submitted to the USDA, which Hildebrand had taken with him when he left Salsbury. Hildebrand had eliminated from the outline all references to Salsbury and destroyed the original outline.

In 1986, Merieux submitted to the USDA a production outline and an application for a license. Merieux' production outline was virtually identical to the Salsbury outline Hildebrand took with him when he left Salsbury. Merieux received a license and began selling an inactivated MG vaccine in 1987. At each step of Merieux' production procedure, various alternatives could have been used—different ingredients, tests and techniques. The methods and ingredients Hildebrand and the researchers at Merieux chose to employ for its initial production of an inactivated MG vaccine were, however, substantially the same as those used by Salsbury.

---

**3.** A bacterin is a vaccine prepared from a bacterium.

## III. DISCUSSION

It is plaintiff's contention that Merieux' development and production for sale of an inactivated MG vaccine and of SBH were greatly facilitated by the misappropriation of Salsbury's trade secrets by defendants after Hildebrand, and later, Berg, left Salsbury to join its competitor, saving Merieux considerable time and expense and giving it a significant competitive advantage. Defendants maintain that they performed legitimate, independent research and used unprotected information in the public domain in order to develop Merieux' competing vaccine.

■■■ Trade secret law provides protection for "commercial intangibles," seeking to prevent exploitation of those intangibles, to encourage innovation, and to maintain standards of commercial ethics. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481, 94 S.Ct. 1879, 1886, 40 L.Ed.2d 315 (1974); *Water Services, Inc. v. Tesco Chemicals, Inc.*, 410 F.2d 163, 171 (5th Cir.1969). There is no dispute that Georgia law applies to plaintiff's claim of misappropriation of trade secrets. Under Georgia law, a trade secret,

> within the rules pertaining to the rights which can be protected by injunction, is a plan, process, tool, mechanism, or compound, known only to its owner and those of his employees to whom it must be confided in order to apply it to the uses intended.

*Thomas v. Best Manufacturing Corp.*, 234 Ga. 787, 789, 218 S.E.2d 68, 71 (1975). In a case involving the alleged misappropriation of an idea, the Georgia Court of Appeals stated:

> 'The elements essential to a recovery for the wrongful appropriation or conversion of an unpatented or unpatentable idea or product are: (1) the idea must be novel; (2) the disclosure of the idea must be made in confidence; (3) the idea must be adopted and made use of by the defendant; and (4) the idea must be sufficiently concrete in its development to be usable.'

*Jones v. Turner Broadcasting System, Inc.*, 193 Ga.App. 768, 770, 389 S.E.2d 9, 11 (1989) (quoting *Morton B. Katz & Associates, Ltd. v. Arnold*, 175 Ga.App. 278, 280, 333 S.E.2d 115 (1985)), cert. filed, (May 29, 1990). The secrets must be those of the plaintiff, not general secrets of the trade; they must also have commercial value. *Vendo Co. v. Long*, 213 Ga. 774, 777, 102 S.E.2d 173, 175 (1958). Trade secrets may be protected even in the absence of a written agreement, *Thomas v. Best Manufacturing Corp.*, 234 Ga. at 789, 218 S.E.2d at 71, and will be protected "so long as competitors fail to duplicate them by legitimate, independent research." *Id.*

### A. Existence of a Trade Secret

■■■ Appellants contend that the district court misconstrued Georgia law in determining that Salsbury possesses a trade secret. We find, however, that the district court applied the proper standard adopted by the Georgia courts.[4] Appellants further argue that even under the proper definition of trade secret stated in *Thomas v. Best Manufacturing Co., supra*, Salsbury did not establish that it possesses a trade secret. The district court found in part that the precise process in its entirety that Salsbury used in producing MG–BAC does not exist in the public domain and constitutes a trade secret. The district court concluded, and we agree, that

> [a]t each individual step of the process, there are a variety of alternatives that could be selected for use. Salsbury, through much research and experimentation, chose specific ingredients, specific

---

**4.** Appellants' argument that the district court erroneously applied the definition of trade secret found in the Restatement of the Law of Torts apparently stems from the district court's reference to *Water Services, Inc. v. Tesco Chemicals, Inc.*, 410 F.2d 163 (5th Cir.1969), and *Cataphote Corp. v. Hudson*, 444 F.2d 1313 (5th Cir. 1971). In those decisions, the court applied a broader definition of trade secret, found in the Restatement, than that currently used by the Georgia courts. *See Textile Rubber & Chemical Co. v. Shook*, 243 Ga. 587, 590, 255 S.E.2d 705 (1979) (*Water Services* "utilized a broader definition of trade secret than has been adopted in Georgia"). The district court's reference to those cases, however, related to whether novelty is a requirement of a trade secret. *See infra.*

amounts for each ingredient, specific methods, and specific ways in which to employ each method, at each individual step in the MG–BAC production process. The combination arrived at by Salsbury has resulted in a unique production process unknown to Salsbury's competitors or to anyone in the vaccine industry. Order of April 6, 1989 at 38.

This production process as a whole fulfills the requirements of a trade secret. The evidence establishes that it is a process the precise elements of which are known only to Salsbury and its employees who in confidence worked extensively on the development of MG–BAC.

Contrary to appellants' contention, the district court did not ignore Georgia's novelty requirement by relying upon *Cataphote Corp. v. Hudson,* 444 F.2d 1313, 1315 (5th Cir.1971), and *Water Services, Inc. v. Tesco Chemicals, Inc.,* 410 F.2d 163 (5th Cir.1969). In those cases, the Court of Appeals for the former Fifth Circuit "guessed" that Georgia would not require novelty to be proved. 410 F.2d at 172–73. More recent Georgia cases have required a concept or product to be "truly unique and original." *See, e.g., Wilson v. Barton & Ludwig, Inc.,* 163 Ga.App. 721, 296 S.E.2d 74 (1982); *see also Kewanee Oil Co. v. Biscron Corp.,* 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974) ("Novelty, in a patent law sense, is not required for a trade secret.... However, ... secrecy, in the context of trade secrets, ... implies at least minimum novelty."), and *Outside Carpets, Inc. v. Industrial Rug Co., Inc.,* 228 Ga. 263, 268, 185 S.E.2d 65, 68 (1971) (fact question existed as to "whether the machine [a fusing oven] and the process [to laminate vinyl backing to carpets and rugs] upon which the plaintiff bases its claim is nothing more than a process and device generally in use in the carpet and mat producing industry"). The district court found that Salsbury's process for producing MG–BAC had never been used prior to its development by Salsbury and did not exist in the public domain. The steps of Salsbury's process had never been combined in the same manner prior to Salsbury's developing the process, and the re-

sult was a unique production process. The record supports the finding that producing MG–BAC on a commercial scale was a novel accomplishment which took several years to achieve, that a commercial MG bacterin was not in existence and had not yet been manufactured in the United States before Salsbury developed MG–BAC, and that the process itself as performed by Salsbury was not known to Salsbury's competitors or to anyone in the vaccine industry and not generally in use. Thus, plaintiff's process of manufacturing its MG bacterin fulfills the novelty requirement.

Nor was the development of MG–BAC merely an extension of the existing methods of producing an MG vaccine on a small scale. *Cf. Wilson v. Barton & Ludwig, Inc., supra* (appellant's idea of rental management merely utilized the existing system of neighborhood offices and enlarged its scope). While the autogenous MG vaccine provided the basis for commercial development, there is ample evidence that much time, labor and money were expended by plaintiff in developing a new process and product. Once plaintiff introduced MG–BAC in 1982, it was the sole marketer in the United States of that vaccine until 1987.

Salsbury proved that it possessed a process known only to it and its employees to whom it was necessary to be confided in order to apply it to the uses intended. *Thomas v. Best Mfg. Corp.,* 234 Ga. at 789, 218 S.E.2d at 71. This is not a case of a plaintiff complaining of the simple loss of expertise of its employees, *cf. Textile Rubber & Chemical Co.,* 243 Ga. at 591, 255 S.E.2d at 708. Plaintiff disclosed its trade secret information to Hildebrand and Berg in confidence; they were in a position of trust while employed by plaintiff, and the work they performed resulted in the formulation of a specific process to produce MG–BAC on a commercial scale. Appellants were aware that Salsbury wished to maintain the confidentiality of its developments. Hildebrand and Berg both signed Patent Assignment and Trade Secrecy Agreements at Salsbury, as they did when they came to Merieux. Salsbury had implement-

ed a number of other internal controls to prevent the unauthorized dissemination of information it considered to be confidential or a trade secret. The record contains memoranda which were circulated to employees outlining Salsbury's policy of maintaining confidentiality; the memoranda stated that product outlines and research reports could be transmitted only with prior authorization and that records were to be made of the transmittals. There was also testimony that access to certain research data was controlled and access to Salsbury's facilities was limited. *See University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir.1974) (plaintiff "used great caution in attempting to preserve its confidentiality").

Plaintiff's process is also sufficiently concrete to be a trade secret. *Cf. Shanco Int'l, Ltd. v. Digital Controls, Inc.*, 169 Ga.App. 184, 187, 312 S.E.2d 150, 153 (1983) (idea to expand known card games to video games was not novel or sufficiently concrete to be usable so could not be usurped, thus was too abstract for protection as a trade secret). Furthermore, plaintiff's production process possesses commercial value. Defendants' witness, Dr. Yoder, who was qualified as an internationally recognized expert in mycoplasma and avian species, testified in regard to Salsbury's production outline submitted to the USDA as part of the licensing process:

> Well, it didn't surprise me one bit that they mentioned a commercially licensed product and told me almost nothing about it; otherwise, they'd be giving the world their production protocol.

> .     .     .     .     .

> They would be—I shouldn't say crazy, but that wouldn't be a very good econom-

ic thing for their company, to tell people how to make their bacterin.

Rec. Vol. 4 at 142.

Several years of experimentation and effort were required before Salsbury perfected the multi-step process to produce the inactive MG–BAC vaccine on a commercial scale. Defendants Hildebrand and Berg learned of the specific formulations in the proper order which would successfully yield Salsbury's product while they worked at Salsbury. Salsbury is entitled to protection of that process as a trade secret. Thus, the district court did not clearly err in its determination that plaintiff possesses a trade secret in the MG–BAC process as a whole under Georgia law. *See Wilson v. Barton & Ludwig*, 163 Ga.App. at 724, 296 S.E.2d at 78 (the determination of the existence of a trade secret has been treated as a question of fact).[5]

Because we conclude that Salsbury's entire multi-step process is a trade secret, we do not consider the district court's holding that several of the individual steps of the production process are also entitled to protection as trade secrets.[6]

**B.** *Misappropriation*

With the existence of a trade secret established, it must be determined whether the process used by Merieux closely resembles Salsbury's. *Outside Carpets*, 228 Ga. at 267, 185 S.E.2d at 68. There is no doubt that Salsbury's process to produce MG–BAC was adopted and used by the defendants. *Jones v. Turner Broadcasting*, 193 Ga.App. at 770, 389 S.E.2d at 11. Merieux had not begun developing an inactivated MG bacterin at the time Hildebrand was hired. Once Hildebrand was employed by Merieux, the company decided to begin producing just such a vaccine, the production of which Hildebrand supervised. He instructed researchers to use the same strain

---

**5.** It is interesting to note, as did the district court, that Merieux filed the production outline for its own vaccine, GALLIMUNE, under seal in the district court; Hildebrand testified that he considered Merieux' production outline to be strictly confidential and a trade secret of Merieux.

**6.** Appellants do not challenge on appeal the trial court's finding that the formula for Stabilizer H is a trade secret, nor do they raise as an issue its alleged misappropriation. We, therefore, do not address the issue. We also find it unnecessary to consider appellants' claim that the district court erroneously concluded that certain documents are trade secrets.

used at Salsbury and the same formulation for the medium as was used at Salsbury. Hildebrand provided a Merieux researcher with a redacted copy of the MG–BAC production outline Hildebrand had taken with him when he left Salsbury, and he later sent a copy to Merieux' parent company to report Merieux' progress. Merieux proceeded to use the same two tests as Salsbury to identify the MG organism at the beginning of the production process. Merieux uses three processes in preparing its medium which Salsbury considered to be unique to the MG–BAC medium. Merieux utilizes several of the same conditions and procedures, in the same order, for growth of the organism, inactivating the organism, inhibiting the growth of other organisms during fermentation, controlling the pH of the medium, concentrating the organism, and challenging or testing the organism.

Once Hildebrand and Berg left Salsbury and began work on an MG vaccine at Merieux, they misappropriated Salsbury's property. Hildebrand and Berg had a right to take with them the skill they had acquired, the knowledge they had obtained, and the information they had received, but not the property of their former employer. *Textile Rubber*, 243 Ga. at 591, 255 S.E.2d at 708. The evidence supports the district court's finding that Merieux' production process for its GALLIMUNE vaccine was substantially derived from Salsbury's MG–BAC production process; Hildebrand and Berg began their work at Merieux using the same compounds and steps in the same order as they had used at Salsbury. The court could properly find that the virtual duplication of Salsbury's MG bacterin by Merieux was not through legitimate, independent research but by unlawful appropriation by defendants. *Water Services*, 410 F.2d at 172.

### C.  Liability of Merieux

■   Appellants contend that liability should not be imputed to Merieux because appellee did not prove that Merieux conspired with Hildebrand and Berg or that Merieux knew of a breach of obligation by Salsbury's two former employees. Appellee avers, however, that appellants waived the right to raise this issue because they failed to present it to the district court in the context of the misappropriation claim.

Whether or not appellants waived this claim, it is without merit. The undisputed evidence fully supports the trial court's findings of required facts to hold Merieux liable. Before Merieux hired Hildebrand, Hildebrand sent a letter to a Dr. Gaudry, the Product Manager at Rhone–Merieux and a vice-president of Merieux, detailing Hildebrand's background. The letter informed Dr. Gaudry that Hildebrand directed the research, development and licensing of MG–BAC at Salsbury. According to Hildebrand's testimony, he informed Dr. Gaudry that he was "personally involved in the direction of the research and product development and licensing of two especially innovative as well as commercially successful products," one of which was an avian MG bacterin (MG–BAC). · Rec.Vol. 8 at 19. After writing the letter, Hildebrand met with both Dr. Gaudry and a Mr. Mahler, who is the President of Rhone–Merieux and of Merieux.

It is clear from the record that Merieux was fully aware of Hildebrand's role in the development, production and licensing of MG–BAC at Salsbury, that Salsbury was the only company in the United States commercially producing an inactivated MG bacterin at that time, and that Merieux began development of a competing vaccine only after Hildebrand was hired. The relation between Merieux and Hildebrand, who was hired as general manager, was such that the company knew of and had an interest in the circumstances surrounding the work Hildebrand and Berg performed at Salsbury and subsequently at Merieux. *See Outside Carpets*, 228 Ga. at 269, 185 S.E.2d at 68–69.

When Hildebrand contacted Berg in October 1985 about Berg's joining Merieux, Hildebrand was an officer at Merieux and represented the company's interests. He was authorized by the Board of Directors to fill the position. Hildebrand obviously knew that Berg had worked on MG–BAC at Salsbury, because they had worked together, and he so testified:

Q: And you were aware, of course, that he [Berg] was the key person in the development of MG–BAC at Salsbury, were you not?

Hildebrand: Well, Mr. Berg was—Yes. Mr. Berg was involved in the development of the product.

Rec.Vol. 8 at 31–32. The record fully supports the inference that Merieux did not "innocently" undertake to develop, manufacture and license an MG vaccine, as appellants claim it did. We thus find no error in the district court's finding of liability on the part of Merieux, along with Hildebrand and Berg, for misappropriation of Salsbury's trade secrets.

## D. *Damages*

### (i) Compensatory Damages

■ The trial court awarded Salsbury $52,000.00 in compensatory damages, which is the profit Merieux admitted it gained from the sale of GALLIMUNE through August 1987. Initially the trial court had awarded damages for plaintiff's lost profits; the court later amended its order, instead basing the measure of damages on the $52,000 gain to Merieux from its use of the misappropriated trade secret information. *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir.1974) (damages for misappropriation of trade secrets are measured by the value of the secret to the defendant "where the secret has not been destroyed and where the plaintiff is unable to prove specific injury"). In addition, the district court found that Salsbury had spent over $1 million researching and developing MG–BAC[7] and more than $2 million marketing and advertising the vaccine,[8] for a total of $3 million. Of that amount, the court

awarded Salsbury $1 million, representing the savings in research, development and marketing Merieux enjoyed as a result of misappropriating Salsbury's trade secrets.[9] The court declined to award the total cost, noting that Salsbury had also benefited from its expenditures.

Appellants contend that the $1 million award should be vacated because Merieux' profit of $52,000 represents its full gain from the use of Salsbury's trade secrets and any savings are reflected in the $52,000 figure. Appellants argue that if Merieux had expended additional sums (without having had the benefit of Salsbury's trade secrets), Merieux' profits would have been correspondingly lower. Therefore, Merieux argues, the award of profits and savings results in a double recovery.

If Merieux had not had the benefit of Salsbury's research, development and marketing, the court could properly infer that Merieux would have been required to expend approximately the same amount as Salsbury on the research, development and marketing of its vaccine from scratch. Merieux' profits would have been reduced by that amount; hence, the company would presumably be left with no profit. Thus, if Merieux had been required to spend the amount Salsbury expended, Merieux would not have made the $52,000 profit the court required Merieux to disgorge. The district court discounted the total expenditures to $1 million. This is appropriate because Merieux actually incurred costs in researching, developing and marketing its own vaccine, even with the advantage of Salsbury's trade secrets. By not charging Merieux the full $3–5 millions claimed by the plaintiff, the court arrived at an amount that fairly reflects only the savings

7. This figure represents the cost of 14 man-years of work over the several years Salsbury spent developing MG–BAC. One man-year equals 2080 hours (40 hours per week multiplied by 52 weeks per year). In making its finding, the court credited the testimony of Dr. Dean Welch, Vice–President of Operations at Salsbury since late 1982. Dr. Welch previously held the positions of Vice–President for Biological Operations for one year and, starting in 1970, Vice–President for Research and Development.

8. The court based this finding on the testimony of Mr. William Davies, who was Director of Business Development from 1982 until 1984, when he became Vice–President of Marketing. Plaintiff claimed it had spent $2–4 million on advertising and marketing.

9. The court determined that Salsbury should receive $750,000.00 for the wrongful use of its research and development efforts and $250,000.00 for the wrongful use of its advertising and marketing strategies.

inuring to Merieux. The $52,000 award should, therefore, be disallowed, which will avoid any duplicative recovery.

(ii) Punitive Damages

The trial court assessed an award of punitive damages of $500,000.00 against defendants "to penalize them for their conduct and to deter them from engaging in similar conduct in the future." The Georgia statute applicable to causes of action for torts arising before July 1, 1987 provides:

> (a) In a tort action in which there are aggravating circumstances, in either the act or the intention, the jury may give additional damages to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff.

O.C.G.A. § 51–12–5(a) (Supp.1989). An amendment to the statute, which applies only to causes of action arising on or after July 1, 1987, permits an award of punitive damages "to punish, penalize, or deter a defendant." Tort Reform Act of 1987, O.C.G.A. § 51–12–5.1 (Supp.1989).

■ Appellee argues that both statutory provisions apply, because defendants have committed a continuing tort which commenced prior to July 1, 1987 and has not ceased. Since this case involves protection of a property right and is not a suit for personal injury, however, we do not believe the continuing tort theory is applicable under Georgia law. *Mercer University v. National Gypsum Co.*, 258 Ga. 365, 368 S.E.2d 732, 733 (1988). Here, the wrongful act of misappropriation and the damage both existed before July 1, 1987, and section 51–12–5 should apply to this action. *Cf. Jankowski v. Taylor, Bishop & Lee*, 246 Ga. 804, 273 S.E.2d 16 (1980) (determining when a cause of action for a tort accrues for purposes of the statute of limitations).

■ Punitive damages may only be awarded if there is evidence of "willful misconduct, malice, fraud, wantonness or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences."

*General Refractories Co. v. Rogers*, 240 Ga. 228, 230, 239 S.E.2d 795, 798 (1977). Under § 51–12–5, punishing the defendant is not a proper ground upon which to base an award of additional damages; deterring the defendant from similar future conduct is, however. This latter reason is one upon which the district court rested its award, and we are of the opinion that the assessment should stand. *Cf. Wammock v. Celotex Corp.*, 835 F.2d 818, 822 n. 9 (11th Cir.1988) ("Although the district court had incorrectly stated the reasons for punitive damages, the court had correctly charged the jury as to what they would have to find in order to award punitive damages."). Moreover, the record contains sufficient evidence of willful misconduct, which the court carefully evaluated, to support such an award under Georgia law.

(iii) Attorney's Fees and Other Expenses

■ Pursuant to O.C.G.A. § 13–6–11, the trial court awarded attorney's fees of $562,424.31 and "in-house" costs of litigation of $121,177.45, which included $96,497.50 for in-house personnel time and $24,679.95 in travel and other related expenses. Section 13–6–11 provides:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

O.C.G.A. § 13–6–11 (Supp.1989). "Bad faith refers to the transaction out of which the cause of action arose...." *Cade v. Roberts*, 175 Ga.App. 800, 801, 334 S.E.2d 379, 380 (1985). The district court found that plaintiff sought attorney's fees in its complaint and defendants acted in bad faith in causing appellee's injury, satisfying the requirements of section 13–6–11.

Appellants' principal objection to this part of the award is that the charge for services of in-house personnel is not an expense of litigation under § 13–6–11 because those costs do not correspond to ac-

tual out-of-pocket expense incurred by Salsbury. Appellants refer us to *Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir. 1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984). There, this Court found that according to Florida case authority, a party could recover the reasonable value of in-house counsel's services only where the defense was furnished by house counsel. Since the plaintiff's house counsel acted merely as a liaison between the client and outside counsel, who actually handled the case, no award for in-house counsel fees was permitted. Moreover, under a written agreement between the parties, the plaintiff was entitled to indemnification and reimbursement for costs and attorney's fees for the defense of a legal action; since the defendant did not pay out additional money for the services of its house counsel, it could not claim reimbursement for what was a fixed corporate expense. *Id.* at 1499.

The parties here did not enter into such an agreement, nor are we presented with similar Georgia authority. The statute speaks in terms of "expenses of litigation." This is a broad term which, so far as we have been informed by appellants, has not been defined or narrowed by Georgia courts. We, therefore, do not find clearly erroneous the trial court's finding that the time spent by its in-house non-attorney personnel was spent solely because of this litigation. We thus hold that it was an "expense of litigation" under Georgia law.

We conclude that the trial court did not err in finding that the statutory requirements for recovery of litigation expenses were met, and we affirm the award of attorney's fees and other expenses of litigation.

## IV. CONCLUSION

After careful consideration of the record and the applicable Georgia law, aided by the thorough findings of the district court, we are convinced that the trial court could properly find that appellants wrongfully appropriated secrets and confidential information of appellee which are entitled to protection under trade secret law. The de-

fendants have caused much time and money to be spent by Salsbury to vindicate its rights, and the damage award is warranted, with the exception of the award of $52,000 as noted above.

Accordingly, the judgment is AFFIRMED as modified by the deduction of the sum of $52,000 from the damages awarded to plaintiff.